(206 P.3d 40)
No. 100,041

SANTA ROSA KM ASSOCIATES, LTD., P.C., *Appellant/Cross-appellee*, v. PRINCIPAL LIFE INSURANCE COMPANY and PRINCIPAL REAL ESTATE INVESTORS, LLC, *Appellees/Cross-appellants*.

Opinion filed April 24, 2009.

*Michael S. Jones* and *Steve Howe*, of Jones Law Firm, P.A., of Overland Park, and *Charles S. Kramer* and *Joseph D. Schneider*, of Riezman Berger, P.C., of St. Louis, Missouri, for appellant/cross-appellee.

*Irv Belzer, Jeremiah J. Morgan*, and *Joletta M. Friesen*, of Bryan Cave LLP, of Kansas City, Missouri, for appellees/cross-appellants.

Before MCANANY, P.J., MARQUARDT and MALONE, JJ.

MCANANY, J.: Santa Rosa KM Associates, LTD., P.C. (Santa Rosa), challenges the validity and enforceability of the prepayment provision in a promissory note held by Principal Life Insurance Company and serviced by Principal Real Estate Investors, LLC.

(collectively Principal). In its cross-appeal, Principal challenges the district court's denial of attorney fees after Principal was granted summary judgment on Santa Rosa's claim.

### Uncontroverted Facts

The uncontroverted facts in the parties' competing summary judgment motions establish that in September 1991, Dennis Eskie was the owner of the Santa Rosa Shopping Center in Olathe. He borrowed $6,375,000 from Principal and gave Principal his promissory note in that amount. The note was secured by a mortgage on the property. The note contained the following, which is referred to as the "make whole premium" provision:

> "No privilege is reserved by the [debtor] to prepay any principal of this note prior to Maturity Date, except . . . after giving [60] days' prior written notice to the holder of this note, to prepay in full . . . all principal and interest to the date of payment, along with . . . [any other relevant charges, including] a 'Make Whole Premium.' The Make Whole Premium shall be the greater of [either 1%] of the principal . . . to be prepaid or a premium calculated as follows:
>
> (a) Determine the 'Reinvestment Yield.' The Reinvestment Yield will be equal to the yield on the 8 3/4 May 2017 U.S. Treasury Issue ('primary issue') published two weeks prior to the date of prepayment and converted to an equivalent monthly compounded nominal yield.
> (b) Calculate the 'Present Value of the Mortgage.' The Present Value of the Mortgage is the present value of the payments to be made in accordance with this note (all installment payments and any remaining payment due on the Maturity Date) discounted at the Reinvestment Yield for the number of months remaining from the date of prepayment to the Maturity Date.
> (c) Subtract the amount of the prepaid proceeds from the Present Value of the Mortgage as of the date of prepayment. Any resulting positive differential shall be the premium."

Both the note and mortgage contained liquidated damages provisions that applied if the holder of the note accelerated payment due to the borrower's default. In that event, liquidated damages were to be calculated using the same "make whole premium" used in instances in which the debtor prepays the note.

The note also contained a promise by the debtor to pay "all reasonable costs and expenses, including attorney's fees, incurred by the holder [of the note] in connection with any default or in any

proceeding to enforce any provision of this note or any instrument by which it is secured." The mortgage included the following:

"[Borrower] agrees that all reasonable costs . . . including attorneys' fees, incurred or expended by [Principal] arising out of . . . any action, proceeding or hearing, legal, equitable or quasi-legal, including the preparation therefor and any appeal therefrom, in any way affecting or pertaining to this mortgage, the Note or the premises, shall be promptly paid by [Borrower.]"

Santa Rosa is a Florida real estate investment company. Fred Chikovsky, the president of Santa Rosa, is a lawyer and real estate investor. Over the years, Chikovsky has been involved in the acquisition and financing of seven real estate properties. Five of those transactions involved similar prepayment provisions. In four of those transactions, he negotiated either a waiver or some form of settlement of the prepayment provision.

In February 1998, Santa Rosa purchased the shopping center from Eskie and assumed his note and mortgage. The assumption required Principal's consent. Accordingly, Santa Rosa and Principal agreed to modify the mortgage to change the name of the borrower and to delete provisions relating to future sales, transfers, or conveyances of the mortgaged property. None of the changes involved the "make whole premium" provisions. Since assuming the note Santa Rosa has made all the required payments and is not in default.

In April 2005, Santa Rosa considered an early pay-off of the outstanding $4,865,142.24 principle balance on the note. Principal informed Santa Rosa that under the formula in the promissory note the "make whole premium" would be $1,636,268.96. As a result, Santa Rosa commenced this declaratory judgment action seeking a declaration that the "make whole premium" is invalid and unenforceable. Principal defended its validity and asserted a counterclaim for attorney fees. In the course of discovery, Principal acknowledged through its corporate representative, Todd Everett, that upon prepayment of a loan the proceeds are normally reinvested in a manner that exceeds the U.S. Treasury bill rate of return.

*Summary Judgment*

The parties filed cross-motions for summary judgment. The court entered summary judgment, declaring the "make whole premium" provision to be valid and enforceable. While the court found Principal's claimed attorney fees to be reasonable, it denied relief on Principal's counterclaim because Santa Rosa presented a "legitimate question for a declaratory judgment suit" and because K.S.A. 58-2313 allows attorney fees only in collection actions. Santa Rosa appeals. Principal cross-appeals the district court's denial of attorney fees.

Since Santa Rosa's appeal asks us to review the district court's entry of summary judgment, we consider de novo the cross-motions for summary judgment on the issue of the validity of the "make whole premium" provision using the same standards applicable in the district court. Those standards are well known to the parties and are set forth in detail in *Korytkowski v. City of Ottawa,* 283 Kan. 122, 128, 152 P.3d 53 (2007).

*1. Expert Testimony*

Santa Rosa's first three points of error relate to the district court's claimed erroneous reliance on expert testimony in granting summary judgment while preventing Santa Rosa from taking additional depositions to obtain its own expert testimony with which to controvert assertions by Principal's expert which were contained in Principal's claimed statements of uncontroverted fact.

Prior to filing the cross-motions for summary judgment, each party made its expert witness designations. Nevertheless, the parties agreed that the case appeared ripe for summary judgment without input from the experts; and if that proved not to be the case, the parties could engage in additional discovery and depose the expert witnesses after summary judgment was denied. The parties each contended in its summary judgment motion that there remained no genuine issue of material fact and each was entitled to judgment as a matter of law on the issue of the validity of the "make whole premium" provision.

Santa Rosa claims that in entering summary judgment the district court relied on expert testimony from Todd Everett, Princi-

pal's corporate representative, to the effect that the formula for Principal's "make whole premium" provision is the standard formula used throughout the industry. Everett had been deposed by Santa Rosa and, in the course of his deposition, he characterized the formula for Principal's "make whole premium" in this fashion. Principal contends that the district court did not rely on this testimony in granting summary judgment, though both sides cited some of Everett's deposition testimony in their respective statements of uncontroverted facts.

It is a futile exercise to consider further the conflicting claims on this point. Santa Rosa claims the district court should not have considered Everett's testimony. Principal claims the district court did not consider it in its ruling. Since our review is de novo, we will simply consider the cross-motions anew without reference to the Everett testimony regarding the industry standard to determine if there remains a genuine issue of material fact and, if not, which party is entitled to judgment as a matter of law on the issue of the validity and enforceability of the "make whole premium" provision. If we determine there remains a genuine issue of material fact on the validity issue, our recourse will be to reverse and remand for further proceedings.

### 2. The "Make Whole Premium" Provision

Santa Rosa asserts that the following legal conclusions necessarily arise from the uncontroverted facts: (1) The "make whole premium" provision is an unenforceable penalty, (2) the provision is unenforceable as liquidated damages, and (3) the provision is unenforceable because it results in a windfall to the lender. Finally, Santa Rosa contends that there remained genuine issues of material fact as to whether the "make whole premium" was unconscionable, thereby rendering summary judgment premature.

First, we note that in urging the invalidity of the "make whole premium," Santa Rosa is critical of the provision in the "make whole premium" for payment of one percent of the principal balance of the loan on prepayment because it bears no actual relationship to Principal's loss. This provision did not apply to Santa Rosa. The one percent factor did not enter into the calculation of

the "make whole premium" in this case, so we need not consider it further.

In discussing a provision in a promissory note which limited the debtor's entitlement to prepay the note, our Supreme Court noted in *Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 670-71, 876 P.2d 1362 (1994):

"American courts have traditionally taken the view that competent adults may make contracts on their own terms, provided they are neither illegal nor contrary to public policy and, in the absence of fraud, mistake, or duress, that a party who has fairly and voluntarily entered into such a contract is bound thereby, notwithstanding it was unwise or disadvantageous to that party."

Here, it is uncontested that Santa Rosa was represented by counsel in negotiating to assume Eskie's note and mortgage to Principal. The president of Santa Rosa was an experienced lawyer and real estate investor who had negotiated with lenders before regarding prepayment provisions such as this "make whole premium" provision. The transaction was at arm's length and untainted by fraud, duress, mistake, or overreaching. The only impediment to enforcement of the "make whole premium" would be a finding that it is against our public policy.

On that issue *TMG Life Ins. Co. v. Ashner*, 21 Kan. App. 2d 234, 898 P.2d 1145 (1995), is instructive, though not controlling. In *TMG*, the lender sought to enforce personal guaranties following the borrower's default on a commercial real estate loan. The district court determined that the guarantors were responsible for one-third of the outstanding indebtedness at the time of default. The mortgaged real estate was conveyed to the lender, who then sold it. The district court found that since the proceeds from the sale exceeded one-third of the indebtedness and since the personal guaranties applied only to one-third of the indebtedness, the obligations of the guarantors were satisfied and the guarantors were discharged.

The lender appealed, claiming, among other things, that the district court erred in calculating the obligations of the guarantors by failing to include the prepayment premium due the lender when default was declared. The guarantors contended that the district court did not err in failing to consider the prepayment premium

because the prepayment premium was invalid and against public policy. While the default provision in the promissory note referred to the "prepayment premium," the parties agreed, as did the court, that the "prepayment premium" was to be interpreted using the rules governing liquidated damages, since this was not a case of an alternate means of contract performance but rather compensation for the lender's loss due to the borrower's breach. 21 Kan. App. 2d at 249.

Thus, *TMG* differs from our present case in that it dealt with liquidated damages after default, while the case now before us deals with prepayment of a current loan. Nevertheless, the court's characterization of the prepayment premium in *TMG* applies equally to Principal's "make whole premium." In upholding the lender's prepayment premium, the court in *TMG* stated:

> "The formula used to calculate the prepayment premium is based on the outstanding principal at the time of prepayment and reflects fluctuations in economic conditions between the execution of the mortgage and the time of prepayment. It is not a fixed charge regardless of the amount owing and unreasonable as an estimate of damages for that reason. [Citation omitted.] It does not guarantee equal damages regardless of whether the creditor is favored by early repayment because of rises in interest rates or damaged by loss of a rate of return no longer available in the market at the time of prepayment. [Citation omitted.] Instead, it attempts to estimate the damages that the creditor might face as a result of prepayment under future market conditions unknown at the time of execution." 21 Kan. App. 2d at 250-51.

In *TMG*, the prepayment premium was contained in the default provision of the promissory note and related to damages arising from default. However, in instances of loan prepayments, the lender can also sustain a loss. Here, Principal's "make whole premium" was designed to cover such a loss. See *Overland Park Savings & Loan Ass'n v. Miller*, 243 Kan. 730, 733-34, 763 P.2d 1092 (1988).

Periodic fluctuations in interest rates are inevitable as we move through the business cycle and as financial markets change. Eskie borrowed $6,357,000 from Principal on September 13, 1991, for a term ending April 1, 2017, and at an interest rate of 10.25% per annum. The note does not prohibit prepayment. However, it conditions prepayment upon payment of the "make whole premium."

Santa Rosa, which assumed the loan obligation in 1998, could elect at any time to prepay the loan *if* it paid the "make whole premium." It sought to do so in 2005, a time when interest rates were below those prevailing in 1991.

The "make whole premium" was designed to avoid a "heads I win, tails you lose" outcome when the election to prepay the loan is entirely in the borrower's hands. In a period of rising interest rates, it is in Santa Rosa's interest (and to Principal's disadvantage) to continue making payments at the favorable interest rate on the existing loan. ("Heads I win.") In a period of falling rates, it is in Santa Rosa's interest (and to Principal's disadvantage) to refinance the debt at a lower interest rate, thus forcing Principal to invest the proceeds at a lower rate of interest. ("Tails you lose.") The "make whole premium" provision has the effect of offsetting the downside risk when the borrower, after enjoying a favorable interest rate on the loan during periods of rising interest rates, unilaterally elects to prepay the loan when interest rates fall.

Rather than offending our public policy, such a provision would seem to lend stability and predictability to loan transactions, particularly in commercial loans involving a sophisticated and experienced borrower, such as here. It preserves the benefit to the lender of the bargain made at the time of the loan. It commits the borrower to that same bargain independent of fortuitous fluctuations in interest rates.

Santa Rosa argues, however, that the formula for calculating the "make whole premium" is unreasonable for two reasons. First, it uses the current U.S. Treasury bill interest rate at the time of prepayment to calculate the present value of the future income stream from the loan, in spite of the fact that Principal will reinvest Santa Rosa's loan proceeds for a rate of return higher than the current U.S. Treasury rate. Further, the U.S. Treasury rate is based upon a risk-free investment in government-backed securities.

Second, under the formula the "make whole premium" is that portion of the present value of the future stream of note payments that is greater than the principal balance of the note being paid off by the borrower. However, the formula does not take into account the fact that the lender is not only receiving the outstanding prin-

cipal balance on the loan which it can then reinvest, but also the "make whole premium" itself which can also be invested. Accordingly, the "make whole premium" would be smaller if the formula took into account the "make whole premium" itself together with the future stream of interest income Principal will realize from prepayment. Thus, Santa Rosa argues, the "make whole premium" formula creates a windfall for Principal.

Santa Rosa's first argument regarding the use of the U.S. Treasury bill rate has been rejected by the federal courts for Iowa and Missouri, and a federal bankruptcy court in New York. See *Great Plains Real Estate Dev., LLC v. Union Cent. Life Ins. Co.*, No. 05-00220 (S.D. Iowa June 4, 2007) (unpublished opinion), *aff'd GPR v. UCL*, 536 F.3d 939 (2008); *In re CP Holdings, Inc.*, 332 Bankr. 380 (W.D. Mo. 2005); *In re Finance Ctr. Assoc. of East Meadow, L.P.*, 140 Bankr. 829 (Bankr. E.D.N.Y. 1992). These cases recognize interest rates on U.S. Treasury instruments are easily verifiable and consistently predictable market indicators that are commonly used in prepayment premium provisions. Since the interest rate on a relending of the proceeds turns on many factors such as the amount of the loan; its duration; the location, nature, and quality of the mortgage security; the creditworthiness of the prospective borrower; and the transaction costs attending the origination of a new loan, the rate of return on U.S. Treasury instruments provides a reasonable substitute for trying to find a loan transaction that precisely replaces the investment opportunity lost with the borrower's prepayment.

Finally, in its statement of uncontroverted facts Santa Rosa does not attempt to quantify the new return on investment it contends Prudential would enjoy from reinvesting the prepaid loan proceeds, and it cannot expect us to speculate about the extent of the difference between the U.S. Treasury rate and some unidentified future investment.

Santa Rosa's second argument is more troubling. While it is possible to rewrite the formula to provide a more exact calculation of the loss Principal would have experienced had Santa Rosa paid off the loan in April 2005, the inclusion of the "make whole premium" creates a rather awkward feedback loop in which the amount of

the "make whole premium" must be determined in order to calculate the amount of that same "make whole premium." With our extremely limited knowledge of calculus, we presume such a formula could be fashioned.

The amount of the "make whole premium" is a function of the difference in interest rates between 1991 when the loan originated and 2005 when prepayment was contemplated. Santa Rosa was in complete control of the timing of any prepayment of the loan after 1997. *TMG* teaches that "the reasonableness of a liquidated damages clause should be determined as of the time the contract was executed, not with the benefit of hindsight." 21 Kan. App. 2d at 253. The same perspective, without benefit of hindsight, should apply in evaluating this prepayment provision when there has been no default on the note.

Our function is not to rewrite the parties' contract, but rather to determine whether its terms are so wide of the mark that to enforce them would violate the public policy of our state. In making that determination, *TMG* further cautions us:

"In the absence of clear evidence to the contrary, when parties of equal sophistication negotiate a loan agreement, courts should presume that the creditor gave value, in the form of some other term of the agreement or otherwise, for terms favorable to the creditor in calculating the discount rate and formula to be used in computing the prepayment premium. [Citation omitted.] Moreover, '[t]he parties are not required to make the best estimation of damages, just one that is reasonable.' [Citation omitted.] 'It is immaterial that the actual damages suffered are higher or lower than the amount specified in the clause.' [Citation omitted.]" 21 Kan. App. 2d at 253-54.

While the record is silent as to the financial sophistication of Eskie who negotiated the original terms, Santa Rosa's president had renegotiated similar prepayment provisions before and apparently had the opportunity to do so when negotiating with Principal regarding assumption of this loan. Upon completing those negotiations, Santa Rosa ratified the terms of the note, including the "make whole premium" provision.

Santa Rosa convinces us that the "make whole premium" formula is not the best estimation of Principal's anticipated loss from prepayment of the loan. However, it was not considered so onerous

in 1998 as to cause Santa Rosa not to ratify it. Viewing the transaction prospectively from 1998 and without the benefit of hindsight from 2005 and considering the court's admonition in *TMG*, Santa Rosa fails to show that the formula is so unreasonable as to render it unenforceable.

### 3. *Unconscionability*

Finally, Santa Rosa argues that summary judgment was premature because there remained genuine issues of material fact bearing on the issue of unconscionability. Since our review is de novo, we turn to the competing motions to determine if there remained a genuine issue of material fact on this issue.

Santa Rosa asserts in the preface of its memorandum supporting its summary judgment motion that "there are no material facts in dispute and Santa Rosa is entitled to judgment as a matter of law." Principal responded with its own summary judgment motion on this same issue. It set forth its own statement of uncontroverted facts. In response to Principal's motion, Santa Rosa admitted the essential facts in Principal's statement of uncontroverted facts, with the exception of a few items that do not bear on the unconscionability issue. Santa Rosa did not assert that there remain genuine issues of material fact that preclude summary judgment. Rather, it asserted that the "make whole premium" was so great that it "is simply staggering and shocks the conscience." This appears to be the extent of Santa Rosa's summary judgment argument on the issue of unconscionability.

In oral argument before the district court on the summary judgment motions, Santa Rosa argued that the "make whole premium" is "simply unenforceable because it's unconscionable." It did not argue that summary judgment was premature because of unresolved issues of material fact. The only area in which it expressed the desire for additional discovery was the deposing of experts to counter Principal's contention that its "make whole premium" was the standard in the industry.

Santa Rosa failed to identify any controverted facts which would preclude summary judgment and, to the contrary, represented to the district court that there were none. In fact, on appeal Santa

Rosa cites *State ex rel. Stovall v. DVM Enterprises, Inc.*, 275 Kan. 243, 248-49, 62 P.3d 653 (2003), for the proposition that whether an act is unconscionable is a question of law. Thus, the unconscionability issue was ripe for resolution.

In *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 549 P.2d 903 (1976), our Supreme Court identified various factors to be considered in identifying an unconscionable contract provision. They include:

"(1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position [citations omitted]; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods [citations omitted]; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect [citation omitted]; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract [citation omitted]; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate [citation omitted]; and (10) inequality of bargaining or economic power. [Citations omitted.]" 219 Kan. at 758-59.

See *Ed Bozarth Chevrolet, Inc. v. Black*, 32 Kan. App. 2d 874, 886-87, 96 P.3d 272, *rev. denied* 277 Kan. 923 (2003).

Santa Rosa's sole argument on the issue of unconscionability is that the "make whole premium" is so excessive as to constitute a penalty. As discussed earlier, the considerable amount of the "make whole premium" is a function of the amount of the unpaid balance on the loan and the disparity in prevailing interest rates between the time the loan originated and the time of its proposed prepayment. The time for prepayment was in Santa Rosa's exclusive control.

Further, there is nothing in the uncontroverted facts to suggest unequal bargaining power, exploitation of either Eskie or Chikovsky, or questionable circumstances surrounding the negotiation of the loan or its later assumption. To the contrary, Chikovsky was

knowledgeable about prepayment provisions in commercial real estate loans and had negotiated around them in the past. The "make whole premium" was in normal type in the body of the note and not contained in a fine-print, back-side addendum. There is nothing to indicate that the "make whole premium" was a take-it-or-leave-it or deal-breaker provision in the loan. We have no doubt that it is possible that the amount of a "make whole premium" when coupled with evidence that the lender unfairly exploited an unsophisticated borrower could lead to a finding of unconscionability. However, those are not the circumstances here. Under the uncontroverted facts before us, the amount of the "make whole premium" does not in itself render this provision unconscionable.

### Attorney Fees

In its cross-appeal, Principal argues that the court erred in not awarding its attorney fees. Because resolution of this issue involves matters of contract and statutory interpretation, our review is de novo. *Genesis Health Club, Inc. v. City of Wichita*, 285 Kan. 1021, 1031, 181 P.3d 549 (2008) (statutes); *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001) (contracts); see also *Idbeis v. Wichita Surgical Specialists*, 285 Kan. 485, 490, 173 P.3d 642 (2007) (whether a district court has authority to award attorney fees is a question of law).

The district court denied Principal's claim for attorney fees on two bases: (1) The note and mortgage do not contemplate an award of fees in a declaratory judgment action such as this, and (2) K.S.A. 58-2312 permits the recovery of fees only in a collection action, which this is not.

For over 100 years, from the early years of statehood until 1994, the law of Kansas was that no debt instrument could provide for the payment of attorney fees. See Comp. L. 1885, 68-8a; L. 1876, ch. 77, sec. 1. The statute was moved to R.S. 1923, 67-312 in 1923 and eventually relocated to K.S.A. 58-2312. The substance of the statute remained unchanged throughout these statutory reorganizations.

Consistent with K.S.A. 58-2312, the legislature, in enacting the Uniform Consumer Credit Code (UCCC) in 1973, declared that

no provision could be made for the collection of attorney fees from a consumer in a consumer credit transaction. L. 1973, ch. 85, sec. 35; see K.S.A. 16a-2-507, comment 1. As stated in *Halloran v. North Plaza State Bank*, 17 Kan. App. 2d 840, 843, 844 P.2d 764, *rev. denied* 253 Kan. 857 (1993), *overruled on other grounds Credit Union One of Kansas v. Stamm*, 254 Kan. 367, 867 P.2d 285 (1994):

"Both [K.S.A.] 16a-2-507 and K.S.A. 58-2312 reflect concern that an attorney fee provision 'mulcts debtors for default on a sum not necessarily compensatory,' and can be used 'to fleece necessitous debtors.' *Iola State Bank v. Biggs*, 233 Kan. 450, 462, 662 P.2d 563 (1983) (quoting *Young v. Nave*, 135 Kan. 23, 25, 10 P.2d 23 [1932])."

In 1994, the legislature responded to widespread criticism of *Halloran* (see K.S.A. 16a-2-507, comment 2) by amending K.S.A. 16a-2-507 to permit recovery of attorney fees in collection actions in consumer credit transactions, subject to specified restrictions. See L. 1994, ch. 276, sec. 1. The longstanding attorney fee prohibition in K.S.A. 58-2312 also was amended to provide:

"Except as otherwise provided by law, any note, mortgage or other credit agreement may provide for the payment of reasonable costs of collection, including, but not limited to, court costs, attorney fees and collection agency fees, except that such costs of collection: (1) May not include costs that were incurred by a salaried employee of the creditor or its assignee; and (2) may not include the recovery of both attorney fees and collection agency fees."

This amendment to K.S.A. 58-2312 causes us to question: (1) whether the amendment applies to the note and mortgage created here which predate the amendment, and (2) if so, whether the amended statute bars the assessment of fees in this action.

We conclude that the 1994 amendment to K.S.A. 58-2312 applies to this transaction under the rationale of *Frets v. Capitol Federal Savings & Loan Ass'n.*, 238 Kan. 614, 712 P.2d 1270 (1986). Frets contracted to purchase a home subject to a mortgage which secured a note to Capitol Federal. The note contained a "due on sale" provision. The interest rate on the note was 9.75% per annum, below the maximum 11% rate permitted by K.S.A. 1978 Supp. 16-207 at the time the note was originally given. The statute had been amended by the time of Frits' contract to permit the cap on interest rates to float with the federal lending rate. The pre-

vailing rate at the time of Frets' contract was at or above 14.25% per annum. Capitol Federal agreed to waive the "due on sale" provision in exchange for an increase in the note's interest rate to 12% per annum. Frets agreed, assumed the loan at 12%, and then sued Capitol Federal claiming, among other things, that the note's 12% interest rate was usurious pursuant to the provisions of K.S.A. 16-207 in effect at the time the note was originally given to Capitol Federal. Our Supreme Court concluded that a new contract was entered into between Frets and Capitol Federal and it was governed by the law in effect at the time it was made. Thus, the 12% interest rate was permitted by the amended K.S.A. 1980 Supp. 16-207. 238 Kan. at 620.

Here, the mortgage prohibited Eskie from selling the shopping center subject to the mortgage without Principal's prior consent. Principal agreed to consent to Santa Rosa purchasing the property subject to the mortgage in exchange for Chikovsky assuming Eskie's personal liability under certain provisions in the mortgage and Santa Rosa's ratification of the terms and provisions of the mortgage. The mortgage contained a provision for attorney fees to which Eskie had previously agreed. At the time Santa Rosa agreed to be bound by the provision for attorney fees, K.S.A. 58-2312 had been amended to its current form. Accordingly, the current form of K.S.A. 58-2312 applies to this transaction, and the total ban of attorney fees in the earlier version of K.S.A. 58-2312 does not apply.

The next issue is whether K.S.A. 58-2312 in its current form permits the assessment of attorney fees in this case.

In preenactment legislative committee hearings, Professor Barkley Clark and others testified to the need to abandon the longstanding attorney fees prohibition in debt instruments. Legislators were directed to an article in the Journal of the Kansas Bar Association by Ron Leslie, *Recovery of Attorney Fees—An Historical Perspective*, 53 J.K.B.A. 154 (Fall 1984), in which Leslie listed 75 Kansas statutes allowing recovery of attorney fees in a wide variety of litigated cases such as those involving consumer rights, domestic relations, motor vehicles, public utilities, common carriers, railroads, real estate, and unfair commercial practices. In his remarks

to the House Judiciary Committee on March 22, 1994, Professor Clark observed: "The common denominator of all these statutes is that the Kansas legislature made a policy decision to allow attorney's fees to be awarded in a wide variety of settings."

Committee members were also directed to a Washburn Law Journal Note, *Recovery of Attorney Fees in Kansas*, 18 Washburn L.J. 535, 545 & n.111 (1979), which, as recounted from the committee notes, concluded:

"There appears little rationale for limiting freedom of contract for fees in the commercial context. Presumably, bargaining power disparity and unconscionable conduct are not pervasive problems. Protection in the commercial context should focus on protecting debtors from paying exorbitant fees. Repeal of K.S.A. § 58-2312 should be considered. The statute may have outlived its usefulness. When it was passed in 1876 there was not a body of regulatory law protecting consumer interests and granting remedies for oppressive conduct [as there is now with the (UCCC), the Consumer Protection Act, and other consumer legislation]. Replacement legislation balancing debtors' protection from unreasonable fees and creditors' and society's interest in reduced default expenses is suggested." Minutes, House Jud. Comm. March 22, 1994.

Professor Clark noted Kansas' adoption of the American Rule, which denies the prevailing party attorney fees unless expressly allowed by statute or contract. He observed: "In commercial transactions, K.S.A. 58-2312 is the only statute on the books in Kansas that rejects the American Rule and freedom of contract." Minutes, House Jud. Comm. March 22, 1994. After recounting the statutory and case law history, Professor Clark urged: "In order to put an end to this sorry state of affairs, Kansas law should be reformed to expressly authorize 'to the extent permitted by law' attorney's fee provisions, in addition to authorizing limited attorney's fees provisions in consumer credit (and commercial) transactions." Minutes, House Jud. Comm. March 22, 1994.

While the statute refers to attorney fees in collection actions, the legislative history is devoid of any suggestion that attorney fees in promissory notes should be limited to collection actions to the exclusion of declaratory judgment actions such as the one now before us. In the overwhelming number of cases, the issue of attorney fees arises in the context of a collection action after default. Thus, it is natural for our legislators to address the issue of attorney fees in

this context. Nevertheless, we are convinced that relief from the provision against attorney fees was not intended to be limited to that context. The legislature was lifting the blanket prohibition and restoring freedom of contract to parties to negotiate on the issue of attorney fees, particularly in a commercial context such as we find here.

Thus, we conclude that the assessment of attorney fees in this case is not against public policy because of any prohibition found in K.S.A. 58-2312.

The district court also based its denial of attorney fees on its interpretation of the contract. The note authorized attorney fees "in connection with any default or in any proceeding to enforce any provision of this note or any instrument by which it is secured." The mortgage provided for attorney fees "in connection with any action, proceeding or hearing, legal, equitable or quasi-legal . . . in any way affecting or pertaining to this mortgage, the Note or the premises." The district court construed these provisions to apply only in proceedings following a default (Santa Rosa was not in default), not to the declaratory judgment action initiated by Santa Rosa to litigate the contract issue raised here.

Santa Rosa relies upon the recounting in *Heinson v. Porter*, 244 Kan. 667, 672, 772 P.2d 778 (1989), *overruled on other grounds Glenn v. Fleming*, 247 Kan. 296, 799 P.2d 79 (1990), of the holding in *Franklin Life Ins. Co. v. Johnson*, 157 F.2d 653, 658 (10th Cir. 1946), that " '[t]he purpose of the declaratory judgment action is to settle actual controversies before they have ripened into violations of law or legal duty or breach of contractual obligations.' " While this accurately describes the purpose of a declaratory judgment action, we fail to see how it advances Santa Rosa's cause.

The case annotations to K.S.A. 60-1701 show the wide variety of rights and obligations of parties that has been resolved by declaratory judgment actions. A declaratory judgment, like any other judgment, is final and binding on the parties with respect to the rights and responsibilities declared. While a declaratory judgment may be preliminary to an action to enforce the rights so declared, it need not necessarily be so. The court has jurisdiction in a declaratory judgment action not only to declare the rights and re-

sponsibilities of the parties, but also to grant further relief based upon that judgment. K.S.A. 60-1703.

While the promissory note speaks to actions to enforce rights under the note, the mortgage calls for the recovery of attorney fees in actions "in any way affecting or pertaining to this mortgage, the Note or the premises." We see no viable argument to support the notion that a judicial declaration of the validity and enforceability of the "make whole premium" provision does not affect or pertain to the mortgage, the promissory note, or the Santa Rosa Shopping Center. Under these circumstances, we recognize and give effect to the clearly expressed contract which was ratified and adopted by Santa Rosa as its own. Accordingly, we conclude that the district court erred in denying attorney fees to Principal.

We affirm the district court's judgment with respect to the validity and enforceability of the "make whole premium" provision, reverse the court's order with respect to Principal's attorney fees, and remand to the district court to enter an award to Principal for its attorney fees.