No. 88,657

STATE OF KANSAS *ex rel.* CARLA J. STOVALL, Attorney General, and KANSAS BOARD OF PHARMACY, *Appellants,* v. DVM ENTERPRISES, INC., d/b/a/ CYBRXPRESS; JOHN S. STIVERSON, a/k/a/ SCOTT STIVERSON, d/b/a STIVERCORP, and d/b/a ONLINE PHYSICIANS; DANIEL THOMPSON, M.D.; and HOME PRESCRIPTION SERVICES, INC., *Appellees.*

62 P.3d 653

Opinion filed January 31, 2003.

*James R. McCabria,* assistant attorney general, argued the cause, and *Stacy A. Jeffress,* assistant attorney general, and *Carla J. Stovall,* attorney general, were with him on the briefs for appellant.

*Michael E. Francis,* of Topeka, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

DAVIS, J.: This is an appeal by the State of Kansas from a summary judgment granted in favor of DVM Enterprises, Inc. (DVM) and Daniel Thompson, M.D. The sole issue on appeal is whether the acts or practices of the defendants in selling controlled substances over the internet were unconscionable under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.* The district court concluded they were not and we affirm.

The Attorney General of Kansas filed suit under the KCPA against DVM; Daniel Thompson, M.D.; John Stiverson; and Home Prescription Services, Inc. (HPS) following a sting operation targeting the sale of controlled substances over the internet.

The Attorney General's investigation involved three purchases. Harvey Harris, an attorney general agent, purchased Meridia; Stuart Nelson, a minor under the supervision of an attorney general agent, purchased Meridia; and Joseph Trawicki, also an attorney general agent, purchased phentermine.

On May 23, 1999, Agent Harris visited the Online Physicians website at Stiverson.com for the purpose of purchasing Meridia. Upon selecting the "order" button, Harris' browser was referred to the CybRxpress.com website. In accordance with instructions, Harris entered his height, 71 inches, and his weight, 235 pounds, so that the website could calculate his body mass index. That same web page provided the following information:

"Meridia™ is FDA-approved for weight loss in those individuals with a BMI (Body Mass Index) of 25 or more. If your BMI is less than 25, you should try our All-Natural Weight Loss Program, which uses natural herbs in combination with our patented diet. Meridia causes appetite suppression through neurotransmitters (Dopamine/Norepinephrine/& Serotonin) in the hypothalamus or 'feeding center' of the brain. We have found that the primary advantage of using Meridia™ vs. Phentermine is that clients experience fewer side effects, *i.e.* restlessness and insomnia. The two major draw backs to Meridia™ are: Meridia™ is more expensive than Phentermine, and Meridia cannot be used by anyone taking antidepressants. If you are interested in using Meridia™, please refer to the BMI calculator below to see if you qualify."

He was then asked if he wished to proceed to a Meridia consultation. Harris was required to agree that he understood the consultation information provided him through his internet browser. He was further required to agree to a waiver of liability. Following

the waiver of liability, Harris was directed to the order form. After the order form, Harris reached a medical questionnaire to which he entered truthful information. Harris indicated his date of birth, height, and weight. The questionnaire required him to provide information about blood pressure. Harris was required to indicate whether he was taking any medications for depression and to agree not to take any over-the-counter medicines while taking Meridia without consulting a pharmacist. Additionally, the questionnaire required Harris to agree to monitor his blood pressure once every 2 weeks and to stop taking Meridia if his blood pressure exceeded certain parameters. The questionnaire then asked Harris to list his current medical conditions, medications he was currently taking, along with medications he was planning to take while taking Meridia, allergies, surgeries, and any other information he deemed relevant.

Upon submitting the questionnaire, Harris ordered and paid $250 for a 1-month supply and was informed that Meridia would be shipped pending the approval of a physician. He received Meridia in a bottle indicating that it came from HPS.

On May 24, 1999, Stuart Nelson, a 16-year-old minor, accessed the Online Physicians website at Stiverson.com for the purpose of purchasing Meridia. Nelson experienced the same procedure described above in connection with the Harris transaction. After completion of the required forms, Nelson ordered Meridia, which was paid for through his mother's credit card. On May 26, 1999, Nelson received Meridia in the mail with a label which indicated the prescription drugs came from HPS. Nelson was never contacted by a physician regarding the application. Teresa Salts, an attorney general employee, supervised Nelson's purchase.

On May 24, 1999, Joseph Trawicki accessed the website for Online Physicians at Stiverson.com, indicating that he wished to purchase phentermine. Following the same procedures outlined above, Trawicki's web browser was referred to the CybRxpress.com website. Trawicki completed the consultation form and submitted it. He purchased and received a package of phentermine tablets with the HPS label. Trawicki never had direct contact with a physician regarding the prescription for phentermine.

In its petition, the State advanced three claims against the defendants: Count I, the defendants had committed deceptive acts and practices under K.S.A. 2001 Supp. 50-626; Count II, the defendants had committed unconscionable acts and practices under K.S.A. 2001 Supp. 50-627; and Count III, HPS had violated Kansas statutes regulating pharmacists, K.S.A. 65-1625 *et seq*. The State requested declaratory relief, injunctive relief, damages on behalf of consumers, investigative fees, expenses, civil penalties, and court costs.

The State filed a motion for judgment by default against defendant Stiverson, which the district court granted. Stiverson is not involved in this appeal. The district court also approved a consent judgment between the State and HPS, which is not a party to this appeal.

While this action was pending and after the two remaining defendants, DVM and Thompson, filed their motion for summary judgment, this court entered its decision in *State ex rel. Stovall v. ConfiMed.com, L.L.C.*, 272 Kan. 1313, 38 P.3d 707 (2002). The question this court resolved in *ConfiMed.com* was whether a nonresident medical doctor committed unconscionable acts under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, when he dispensed the sexual enhancement drug Viagra to a Kansas resident without any physical examination or direct contact other than through an out-of-state internet site. 272 Kan. at 1316. Based upon facts similar to those we consider in this case, this court concluded that there were no grounds for a claim of unconscionability under the KCPA. 272 Kan. at 1324.

In this appeal, the defendants rely upon our decision in *ConfiMed.com*. They contend that based upon almost an exact set of facts this court in *ConfiMed.com* concluded that there were no deceptive or unconscionable acts.

DVM and Thompson submitted a copy of the journal entry of consent order in a separate case against them filed December 4, 2000. That order enjoined DVM and Thompson from practicing medicine and dispensing prescription drugs in Kansas:

"It is therefore, ordered that Daniel Lee Thompson and DVM Enterprises, Inc. are permanently enjoined from practicing the healing arts within the State

of Kansas without license or authority. Specifically, these Defendants are enjoined from prescribing, dispensing, or delivering any prescription-only drug to a person located within the State of Kansas unless licensed to practice medicine and surgery by the State Board of Healing Arts, or unless licensed by the State Board of Pharmacy and acting pursuant to a lawful order of another person who is licensed to practice medicine and surgery by the State Board of Healing Arts.

"It is further ordered that these Defendants must post on all written and Internet advertisements a notice that these Defendants will not deliver a prescription-only drug into the State of Kansas, and that this notice will remain on all written and Internet advertisements until such time as these Defendants are authorized to deliver prescription-only drugs into the State of Kansas, as provided by this order."

In its response to the defendants' motion for summary judgment, the State sought to distinguish this case from our decision in *ConfiMed.com* in primarily two respects. First, the State notes that "[t]he *ConfiMed.com* case involved sales of Viagra, a medication available by prescription only, yet not a controlled substance; the present case involves controlled substances which have their own set of state statutory and regulatory laws governing their dispensation." Second, the State, in what must be considered a marked change from what was presented to the district court, attacks the waiver required to be signed before purchase as unconscionable and against Kansas public policy.

Other than its mentioning that scheduled drugs are classified as such based upon the potential for abuse and that such substances may be used to achieve side effects other than related to their intended use, the State relies upon the same arguments advanced in *ConfiMed.com*. The State stresses the absence of a personal consultation with a physician and the minor status of the purchaser. We are reluctant on the basis of the sparse arguments advanced to create separate treatment for the Schedule IV controlled substances in this case under the KCPA. We note that in *ConfiMed.com*, as well as this case, the medications sold required a prescription from a physician. Both cases involved the sale of prescription medication to minors over the internet without physician consultation. Great potential for abuse exists in both kinds of medication, and for this reason dispensing such medication requires a physician and a pharmacy. Thus, in the absence of addi-

tional persuasive reasons, we find the State's assertion that scheduled drugs should be accorded special status under the KCPA fails.

More specifically, the State argues that the waiver of liability required to be signed before purchase is against public policy in Kansas because the consumers and the website sellers were not on equal footing and did not have equal bargaining power; that it was improper to put the burden of collecting the necessary information to make an informed decision on the patient; that some of the information on the website was inaccurate, and that the information provided by the website and the controls surrounding the procedure of dispensing the prescription drugs over the internet were inadequate.

The same district judge who initially decided *ConfiMed.com* found in this case that the defendants engaged in no deceptive acts or practices in violation of the KCPA. See K.S.A. 2001 Supp. 50-626. The State does not contend in this appeal that the defendants' acts were deceptive under the KCPA. The State admitted in its response to DVM and Thompson's motion for summary judgment that each of the online buyers received the medication he requested, in the amount requested, and that all medications were authentic. The State also admitted that the transactions occurred exactly how the State's agents understood they were to occur. The district court noted that there was no harm to the buyers and that the agents of the attorney general had received exactly what they ordered. The district court further concluded that the defendants DVM and Thompson did not engage in any unconscionable acts in violation of K.S.A. 2001 Supp. 50-627, finding that their conduct did not resemble the statutory examples of unconscionable acts under the KCPA.

The Attorney General's appeal was transferred to this court pursuant to K.S.A. 20-3018(c).

Standard of Review

Whether an action is unconscionable under the KCPA is a legal question for the court. K.S.A. 2001 Supp. 50-627(b); see *Waggener v. Seever Systems, Inc.*, 233 Kan. 517, 522, 664 P.2d 813 (1983).

However, our unlimited standard of review is somewhat tempered, as explained in *ConfiMed.com:*

"While we do not retreat from what we have previously said concerning our standard of review as being unlimited, we also note that in *Remco Enterprises, Inc. v. Houston,* 9 Kan. App. 2d 296, Syl. ¶ 3, 677 P.2d 567, *rev. denied* 235 Kan. 1042 (1984), the court said: 'Generally speaking, the unconscionability of acts under the Kansas Consumer Protection Act, K.S.A. 50-623 *et seq.,* and amendments thereto is left to the sound discretion of the trial court to be determined under the peculiar circumstances of each case.'

"The *Remco* opinion also quoted from *Meyer v. Diesel Equipment Co., Inc.,* 1 Kan. App. 2d 574, 570 P.2d 1374 (1977), where the trial court's finding that the KCPA was inapplicable was reversed but the appellate court upheld the trial court's determination that unconscionability did not exist with the following statement:

' "The trial court concluded that defendant's conduct was not unconscionable. We are not of a mind to now hold that defendant's complained-of conduct was unconscionable as a matter of law. With a concept so nebulous as 'unconscionability' involved, it is necessary that a certain amount of leeway be granted trial courts when deciding the unconscionability of acts. Our legislature recognized this and, accordingly, left the unconscionability question to be decided by the court under the peculiar circumstances of each case." ' *Remco,* 9 Kan. App. 2d at 303.

"In addition, a review of 50-627 shows that the determination of unconscionability involves not only a review of the written documents but also consideration of the witness testimony as to actions surrounding the transaction. We have long held that the credibility of witnesses will not be reweighed on appeal. *State v. Chaney,* 269 Kan. 10, 20, 5 P.3d 492 (2000)." 272 Kan. at 1322.

Generally, whether an action is unconscionable under the KCPA is a question of law subject to unlimited review. However, the determination of unconscionability ultimately depends upon the facts in a given case. Thus, to a great extent, the determination is left to the sound discretion of the trial court to be determined on the peculiar circumstances of each case.

## Unconscionability

Unconscionability is not defined in the KCPA, but the Act provides the context for consideration of the term. K.S.A. 50-623 provides:

"This act shall be construed liberally to promote the following policies:
(a) To simplify, clarify and modernize the law governing consumer transactions;

(b) to protect consumers from suppliers who commit deceptive and unconscionable practices;

(c) *to protect consumers from unbargained for warranty disclaimers; and*

(d) to provide consumers with a three-day cancellation period for door-to-door sales." (Emphasis added.)

The KCPA prohibits sellers from engaging in unconscionable acts or practices. K.S.A. 2001 Supp. 50-627(a). ("No supplier shall engage in any unconscionable act or practice in connection with a consumer transaction. An unconscionable act or practice violates this act whether it occurs before, during or after the transaction."). While the KCPA does not define "unconscionability," it does set forth the following statutory examples of unconscionable acts:

"(1) The supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor;

"(2) when the consumer transaction was entered into, the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by similar consumers;

"(3) the consumer was unable to receive a material benefit from the subject of the transaction;

"(4) when the consumer transaction was entered into, there was no reasonable probability of payment of the obligation in full by the consumer;

"(5) the transaction the supplier induced the consumer to enter into was excessively onesided in favor of the supplier;

"(6) the supplier made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment; and

"(7) *except as provided by K.S.A. 50-639, and amendments thereto, the supplier excluded, modified or otherwise attempted to limit either the implied warranties of merchantability and fitness for a particular purpose or any remedy provided by law for a breach of those warranties.*" (Emphasis added.) K.S.A. 2001 Supp. 50-627(b).

The above are the examples referred to by the district court in this case when it concluded that the defendants DVM and Thompson did not engage in any unconscionable acts in violation of K.S.A. 2001 Supp. 50-627, finding that their conduct did not resemble any of the above statutory examples.

In *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 758-59, 549 P.2d 903 (1976), this court identified 10 factors that should be

considered in the determination of whether an act is unconscionable under the KCPA:

"Although the doctrine of unconscionability is difficult to define precisely courts have identified a number of factors or elements as aids for determining its applicability to a given set of facts. These factors include: (1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position [citations omitted]; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods [citation omitted]; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect [citation omitted]; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract [citation omitted]; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate [citation omitted]; and (10) inequality of bargaining or economic power. [Citations omitted.]"

The activity of the defendants in this case does not resemble any of the above-listed factors.

*Willman v. Ewen*, 230 Kan. 262, 266, 634 P.2d 1061 (1981), discussed Kansas case law and the concept of unconscionability, concluding: "The cases seem to support the view that there must be some element of deceptive bargaining conduct present as well as unequal bargaining power to render the contract between the parties unconscionable." In this case, there is no evidence of deceptive or unequal bargaining power. While the State claims inequality between the parties, it acknowledges that there was no deceptive conduct.

Our decision in *ConfiMed.com* addresses many of the arguments raised by the State in this case. This court did not find that the liability waiver requirement was unconscionable under the KCPA. See 272 Kan. at 1315, 1324. We also rejected the State's arguments that a $75 consultation fee, prescribing medication without a physical examination or advisement of the dangers of the medicine, and prescribing Viagra to a minor without consulting the parents or guardian, constitute individually or collectively unconscionable

practices under K.S.A. 2001 Supp. 50-627. 272 Kan. at 1322-23. In addition, we noted that there was no unequal bargaining power established. 272 Kan. at 1323. The same may be concluded in this case.

With respect to the lack of a physical examination and the lack of physical supervision of the patient, the court quoted *Willman*, 230 Kan. at 266, for the proposition that the State needed to prove some element of deceptive bargaining conduct and unequal bargaining power to prove unconscionability. *ConfiMed.com*, 272 Kan. at 1321, 1323. Further, the court quoted *Gonzales v. Associates Financial Serv. Co. of Kansas*, 266 Kan. 141, 166-67, 967 P.2d 312 (1998), for the proposition that there is no claim under the KCPA without evidence of any deceptive or oppressive practices, overreaching, intentional misstatements, or concealment of facts. *ConfiMed.com*, 272 Kan. at 1323. *ConfiMed.com* concluded that (1) the attorney general agents received exactly what they asked for; (2) they never intended to use the drugs they ordered; (3) they received more information than those who receive actual face-to-face consultations; and (4) the information required of the online patients was more in depth than some receive from traditional prescriptions. 272 Kan. at 1324. Again, the same may be concluded in this case. We concluded in *ConfiMed.com*, as we are able to conclude in this case, that the defendants did not deceive, oppress, or misuse superior bargaining power in supplying medication. 272 Kan. at 1324. Other than the State's claim, there is no evidence in the present case of unequal bargaining power.

Finally, the language used by *ConfiMed.com* applies as well to the case we now consider:

"Ultimately, after examining all of the documents and hearing all of the witnesses, the trial court properly held Dr. Levine's actions did not involve advertising techniques, contract terms, debt obligation, *limitation of warranties*, or the type of conduct intended to be considered unconscionable under K.S.A. 2000 Supp. 50-627 of the KCPA." (Emphasis added.) 272 Kan. at 1324.

### The Waivers

The State's major focus before this court is the waiver the buyer is required to agree to before purchase. The State argues that the

waiver requirements, in addition to the defendants taking advantage of the buyers, should convince this court that unconscionable acts have occurred.

With respect to phentermine, DVM required the buyer to agree to the following waiver:

"By choosing 'I Agree' at the bottom of this page, you agree to release from liability and hold harmless DVM Enterprises, Inc., DVM Medical Consultants, Inc., CybRxpress Pharmacies, Inc., CybRxpress Web Services, Inc., 2U-Netmail, LLC, their affiliates, subsidiaries, directors, officers, employees, representatives, and independent contractors from all causes of action, suits, penalties, liens, judgments, liabilities, obligations, losses, actual or consequential damages, actual or threatened claims which may arise at any time by reason of, relating to, arising directly or indirectly out of any matter whatsoever related to the prescription of Phentermine HCL."

The waiver for Meridia contained substantially similar language.

The waiver, by its express terms, applies to the following five entities: (1) DVM Enterprises, Inc. (the present defendant); (2) DVM Medical Consultants, Inc.; (3) CybRxpress Pharmacies, Inc.; (4) CybRxpress Web Services, Inc.; and (5) 2U-Netmail, L.L.C. The waiver also refers to the affiliates, subsidiaries, directors, officers, employees, representatives, and independent contractors of these five entities.

The State argues that the waivers include waivers of the warranty of merchantability and the warranty of fitness for a particular purpose which, according to its claim, adds support to its argument that the waivers are unconscionable under the KCPA. We disagree that the waivers relate to warranty of merchantability and warranty of fitness for several reasons. Rather, we noted in *ConfiMed.com* that the waivers related to liability. Moreover, the waivers related to the prescriptions of Meridia and phentermine, not the quality of the drugs themselves. A distinction must be drawn between the prescription for a medication and the medication. The waiver only applied to the prescription and would arise if Dr. Thompson were negligent in prescribing the drug.

The Uniform Commercial Code (UCC) defines the implied warranty of merchantability as follows:

"(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any." K.S.A. 84-2-314(2).

Thus, in the case of the implied warranty of merchantability, the warranty applies to the quality of the goods. The State does not contend that the quality of the medication was deficient. Again, it must be noted that the State admitted in its response to DVM and Thompson's motion for summary judgment that each of the online buyers received the medication they requested, in the amount requested, and that all medications were authentic.

In the case of the implied warranty of fitness for a particular purpose, the UCC defines the warranty as follows:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose." K.S.A. 84-2-315.

DVM and Thompson argue that the buyer picks out the medication and therefore does not rely on the skill or judgment of the seller. In this case, the goods are to be used for their usual, ordinary purpose. See *International Petroleum Services, Inc. v. S & N Well Service, Inc.*, 230 Kan. 452, 461, 639 P.2d 29 (1981) ("When goods are acquired for the *ordinary purposes* for which such goods are generally used, no implied warranty of fitness for a *particular purpose* arises.").

Finally, the waivers do not qualify as waivers of implied warranty under the UCC. In the case of the implied warranty of merchantability, K.S.A. 84-2-316(2) requires the waiver to be conspicuous and mention the word "merchantability." With respect to the implied warranty of fitness for a particular purpose, the UCC requires that such waivers be conspicuous. K.S.A. 84-2-316(2). Both war-

ranties can be disclaimed with the following type of language: "There are no warranties which extend beyond the description on the face hereof." K.S.A. 84-2-316(2). In the present case, the waivers do not specifically address warranties either expressed or implied.

DVM and Thompson correctly argue that even if the waivers were improper under K.S.A. 2001 Supp. 50-639, seeking a waiver of merchantability and fitness for a particular purpose does not require a finding of unconscionability under K.S.A. 2001 Supp. 50-627(b)(7). Instead, it is one factor to be considered. "[A]n attempt to restrict potential warranties is not itself an unconscionable act per se. [Citation omitted.] Rather, the attempted disclaimer is one element the court must examine in combination with other facts present in the case in determining whether the seller acted unconscionably." *Schweizer v. Dekalb Swine Breeders, Inc.*, 954 F. Supp. 1495, 1504 (1997). Moreover, any attempt to disclaim such warranties is void in Kansas. K.S.A. 2001 Supp. 50-639(e).

The State also argues that the defendants have engaged in unconscionable acts because they took advantage of the buyers, which is a factor of unconscionability pursuant to K.S.A. 2001 Supp. 50-627(b)(1). However, the buyers—in this case the agents for the Attorney General—received exactly what they asked for. See *ConfiMed.com*, 272 Kan. at 1323 ("As the trial court pointed out, Nelson and Crawford paid for Viagra and received Viagra."). The same is true in this case. The online buyers received exactly what they asked for. The record supports the district court's conclusion that the actions of the defendants did not involve deception or unequal bargaining conduct, nor did their actions resemble any of the statutory examples of unconscionable acts or any of the factors this court has identified as unconscionable under K.S.A. 2001 Supp. 50-627(b).

Standing

In their brief on appeal, DVM and Thompson argue that the State is not a consumer under the KCPA and because there has been no harm to consumers in this case, the Attorney General is without standing to bring the present action. The State persuasively

argues that the KCPA grants the Attorney General standing to enforce the provisions of the KCPA whether or not a consumer is involved. The district court did not address this issue. We have addressed the precise question upon which summary judgment was granted and do not reach the question of standing in this opinion.

Affirmed.