# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 10, 2017 Session

## SHAY SIMPSON, ET AL. v. NATIONAL FITNESS CENTER, INC., ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 3-291-15     Deborah C. Stevens, Judge**

---

### No. E2017-00018-COA-R3-CV

---

This appeal arises from a lawsuit filed by plaintiffs Shay and Brian Simpson ("the Simpsons," collectively, or "Ms." or "Mr. Simpson," respectively) against defendants National Fitness Center, Inc. and National Fitness Center, LLC ("National Fitness," collectively). Ms. Simpson and National Fitness orally contracted to allow the Simpsons "a couple of weeks" additional time to consider whether to cancel their club membership. After more than two weeks elapsed, the Simpsons elected to cancel but National Fitness refused to accept the cancellation. This case was tried before the Circuit Court for Knox County ("the Trial Court"). The Trial Court found that National Fitness breached the contract and committed a deceptive act under the Tennessee Consumer Protection Act ("TCPA"). The Trial Court ordered "a return of all monies paid [by the Simpsons] to [National Fitness] . . ." and awarded attorney's fees to the Simpsons. National Fitness appealed to this Court. We affirm the Trial Court in its determination that the Simpsons effectively exercised their right to cancel and that they were entitled to a refund of any monies paid. However, we reverse the Trial Court in its determination that National Fitness violated the TCPA. We, therefore, reverse the award of attorney's fees. We affirm, in part, and reverse, in part, the judgment of the Trial Court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed, in Part, and Reversed, in Part; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Stanley F. Roden, Knoxville, Tennessee, for the appellants, National Fitness Center, Inc., and National Fitness Center, LLC.

Katherine Sanford Goodner and Brady C. Cody, Knoxville, Tennessee, for the appellees, Shay Simpson and Brian Simpson.

# OPINION

## Background

In June 2015, the Simpsons filed suit against National Fitness alleging that it made a number of misrepresentations to them regarding the quality of services provided and that National Fitness misrepresented the amount of time that the Simpsons had to cancel their membership. The Simpsons' complaint set forth causes of action arising from the Tennessee Health Club Act at Tenn. Code Ann. § 47-18-301, *et seq.*, and the TCPA, at Tenn. Code Ann. § 47-18-101, *et seq.* A bench trial occurred in this matter in September 2016.

The Simpsons signed their membership contract with National Fitness in October 2012. The membership contract provided for, among other things, a ten day time period following the club's opening in which members could cancel their membership. The club opened on January 15, 2014. The Simpsons visited on January 25. The Simpsons quickly became dissatisfied with the club, finding it not to their expectations. On February 14, Ms. Simpson spoke with National Fitness Center, Inc. President Lee Sloan ("Sloan") about cancelling the Simpsons' membership. Although the ten days allowed for opting to cancel had expired under the membership agreement, Sloan proposed that the Simpsons give the club "a couple of weeks" at which point he would work with them on their membership contract. Ms. Simpson agreed, and the Simpsons' membership contract was so modified. Whether the phrase "a couple of weeks" was meant loosely and informally or as a hard fourteen day deadline is at the heart of this dispute. The Simpsons meanwhile continued to visit the club. On March 10, 23 days after her initial discussion with Sloan, Ms. Simpson contacted Sloan again and requested that the Simpsons' membership be canceled. Sloan said it was too late and there was nothing he could do. On March 19, National Fitness received a letter from the Simpsons requesting cancellation of their contract.

Ms. Simpson testified at trial as to the sequence of events in this case as follows:

Q. When you expressed your concerns on the 25th, what were you told by the staff at National Fitness Center?
A. That things would get better. That, again, the construction would be completed; that the classes would be, you know, offered once the -- again, like the Pilates and yoga room, that those classes would be offered. Of course, there was -- still completing the pool area, so they promised that, again, those things would get better.
Q. And when was the next time that you visited the facility?

A. I think the next time that we went was on February 8th, if I'm not mistaken, of 2014. And at that time when we went, um, we were not allowed in. We were told at that point by the front desk that our membership was on hold status, if you will. We asked to speak with a member of management. A girl came out and indicated to us that our credit card on file was expired and that we needed to contact member services to take care of it. We asked if we could take care of it that day, and they said no, that again you had to contact member services. We asked if we could go ahead and workout that morning and then come, you know, take care of the credit card situation. But we were not even allowed into the facility. And we were treated -- it was very matter of fact. They were very -- not really understanding to the situation. Again, this was a credit card that had been placed on file over two years ago.

Q. And this was, I think you said, the credit card that you had given with the original agreement in October of 2012?

A. Yes.

Q. Had anyone contacted you ahead of time to say that your credit card was expiring when the facility opened?

A. No.

Q. Anything of that nature?

A. No.

Q. After you attempted to go with your family on February 10th, what was your next interaction with National Fitness Center?

A. I contacted them on February 10th -- if I'm not mistaken, that was on Monday -- to take care of the credit card situation. I expressed my concerns at that point to member services that we were dissatisfied, that they really weren't living up to our expectations of what the facility was going to be like. I think at that point was when they gave me Lee Sloan's name and phone number and asked me to contact him because he was the president of the facility.

Q. Did you contact him?

A. Yes, I contacted him -- I think at that point I left him a voicemail if he could contact me to discuss our concerns. He did call me back. Not sure of the exact date that we talked. But at that point in time, he was very understanding to our concerns. He indicated again that things would get better. We expressed our concerns about Kids in Motion and the hours and things of that nature. And at that point, he reassured us and told us to give it a couple more weeks, again to give time for the facility to get up and running, and then to contact him to let him know if we were satisfied or dissatisfied.

Q. And what was your option if you were dissatisfied?

A. He told us that he would work with our agreement. He would work with our contract at that time.

Q. And did you have any conversations with him about the fee that you were charged?

A. Yes. I inquired about we had been charged a $30 late fee because the credit card had expired, and he agreed to waive that fee of $30.

Q. And when was your next contact with National Fitness Center?

A. I went back once on my own. My husband went back once on his own. We went as a family. It was approximately -- it was a little over two weeks -- I think it was 18 days or something of that nature that I contacted Mr. Sloan and indicated that we were still not satisfied. The facility still was not to our expectations. And his response was he wished I would have contacted him sooner. But again, he had allowed us two weeks to tour the facility and continue to use it.

Q. Had he given you a hard deadline by which to get back to him?

A. No. It was take a couple of weeks.

Q. And did you ask for any specific deadline or get anything in writing saying that you had a finite period of time to try the facility?

A. No. Unfortunately, no.

Q. Did you continue to try the facility based on your conversation with Mr. Sloan?

A. Yes, we did. Again, we were trying to make it work. We really wanted it to work out for our family. We had tried to get Bree into the Kids in Motion classes. At that time they were starting to get the classes up and running. They were still far and few between. But at that point in time, they were not conducive to our schedule, and so she was not able to participate.

On cross-examination, Ms. Simpson testified as follows:

Q. And you unequivocally stated that Mr. Sloan told you two weeks, correct, to check it out?

A. He told me to give it a couple of weeks.

Q. Couple of weeks. Does that mean three weeks? Does that mean two weeks? What's your definition of a couple of weeks?

A. Two weeks is generally 14 days, but there was no set-hard deadline.

Q. When you wrote the letter, how much time had lapsed since that two weeks or when you spoke to Mr. Sloan?

A. I spoke to Mr. Sloan in February, and I would have to look back and see the exact date in which I wrote that.

Q. You said that you went to the club on February 8th?

-4-

A. Yes, sir.

Q. You had your problem with the card. And then you said on February 10th that you left Lee Sloan a voicemail; is that correct?

A. The 10th was when the customer service had -- or member services had provided me Mr. Sloan's name and number, and to the best of my knowledge, I contacted him on the 10th.

Q. How did you make a -- so you're saying on the 10th is when you had your conversation with Mr. Sloan?

A. I didn't have my conversation with Mr. Sloan on the 10th. I left him a voicemail on the 10th, to the best of my knowledge.

Q. Well, how can you state with certainty that it was 18 days after you had your two-week conversation with Mr. Sloan?

A. Because at the time I had documented everything. Again, I don't have these dates in front of me. I'm going off of memory off of two years ago. But in the letter is when it was so close to the time I had everything documented on my calendar at the time, and I was able to calculate those dates at that time. And I think it was roughly 18 days.

Q. So you had put into a letter that said it was 18 days after you -- Mr. Sloan had given you the two weeks?

A. I had indicated the time I had spoken with Mr. Sloan and based on the time that the letter was written, yes.

***

Q. So this letter to him is clearly received by National Fitness Center a month later after you had your conversation with Lee Sloan about two weeks; is that correct?

A. Yes. The letter itself was received later. In the letter itself, though, it does document the time in which I had spoken with Mr. Sloan on the first occurrence, and it also indicates the secondary call with Mr. Sloan.

Q. And your best -- and you would state that those dates that are recited in your letter are a better and accurate reflection of your memory than now?

A. Yes. Obviously, yes.

***

Q. Well, you certainly realized on March 13, 2014, you were beyond whatever two-week period Mr. Sloan had expressed to you?

A. In my letter, it states it had been two weeks and four days.

Q. And that's when you wrote the letter?

A. The letter is dated -- again, it was a typo, but it was dated March 13th.

Q. Okay. And do you have any proof of when you mailed that letter?

-5-

A. Again, I don't have the documentation with me, as I stated earlier.

Q. Do you know where the documentation is?

A. I would think it would probably be at home if I still have it. Again, it's been two years. It was sent certified mail. But National Fitness Center should have that documentation as well because they received it.

Sloan testified to his interaction with Ms. Simpson as follows:

Q. Okay. After a period of time passed, did you have any -- did you have any further discussions with Shay Simpson after you told her she had two weeks to keep trying it out?

A. Yes. The conversation I had with Shay to begin with was prior to January 14th -- correction -- February 14th. It was prior to February 14th. The next conversation I had with her would have been around March the 10th.

Q. And what did you say to her in that conversation?

A. She called and said that, you know, "I'm still dissatisfied with the child care. Is there a way we can take it off and/or cancel my whole membership?" I told her at that point there was nothing I could do. We gave a ten-day window. The extension of that two weeks beyond that ten-day window was a far reach. And that had -- that couple of weeks, that two-week period was a hard deadline. I could not do anything after that.

On cross-examination, Sloan testified as follows:

Q. When you spoke with Mrs. Simpson the first time on the phone, you testified that you offered to give her a couple of weeks to try the club, try the membership, and get back with you, correct?

A. That is correct.

Q. And I believe you testified that you would try to negotiate her membership. And I may be -- I want to make sure I'm clear on that.

A. It's not a problem. The biggest question they had, once again, was the Kids in Motion. What I told them was give me two weeks, try the club out. If you still have issues with everything going on, let me see what I can do for you.

Q. And did you give -- you didn't give them any kind of hard date or deadline, did you?

A. Specific date pointing at a calendar, no.

Q. There was no drop-dead date; you must get back to me by X?

A. I said two weeks.

Q. But there was no hard deadline, no date on the calendar by which they were told to get back with you?
A. Hard deadline, two weeks. Specific date on the calendar, no.

***

Q. Okay. When you next spoke with Mrs. Simpson, I believe you testified that she contacted you to say she was still not happy and that she wanted out of her membership; is that correct?
A. That is correct.
Q. And you told her it was too late and there was nothing that could be done?
A. Absolutely.
Q. Despite the fact that you had offered for her to take a couple weeks to try the facility?
A. She called me back close to a month later, past the two-week period.
Q. Can you tell me exactly when she called you back?
A. Um, if I'm not mistaken, I think that was around March the 10th. That was March 10th.
Q. When you say "close to a month later," do you remember the date that you told her to take a couple of weeks to try the facility?
A. Prior to the 14th of February.
Q. Are you aware she was not able to enter the facility until after the 20th because of a credit card issue that she called to resolve on the 10th?
A. 10th of what?
Q. February.
A. The 10th of February?
Q. Yes.
A. Your question is -- one more time for me, please.
Q. If you spoke with Mrs. Simpson, you said before the 14th of February?
A. Correct.
Q. And you are aware there was an issue with her credit card, correct?
A. Yes.
Q. If you'll give me just a minute. Are you aware of the date that Mrs. Simpson's credit card was charged to resolve the issues with their membership?
A. I am not.

On re-cross, Sloan testified further as follows:

Q. Mr. Sloan, you testified that you don't have any record of receiving the letter that Mr. Roden was referencing that my client testified that she sent by certified mail?
A. Certified mail, I don't have a copy of it, no.
Q. Okay. But you did send a letter or your board of directors sent a letter on March 28th acknowledging receipt of that letter, correct?
A. They sent a letter back acknowledging receipt of a letter. That letter, I'd have to read it to make sure, but -- and I'm going by my personal knowledge. I don't know of the letter being sent back out. I think there was a letter that was sent back out from conversations, but I would just have to see it to see exactly what it says.

***

Q. My question was, that National Fitness Center sent a letter on March 28, 2014, acknowledging receipt of that letter, correct?
A. I'm sorry. The letter that you gave me is a letter that she sent. I think you're asking --
THE COURT: The question is: Has National Fitness Center received that letter?
THE WITNESS: And I'm saying that was sent to the board of directors and I'm not -- I can't answer that question.
THE COURT: Even after you checked all of the records of the company?
THE WITNESS: If I saw it again, I would know. I'm not trying to be difficult. I don't want to mislead you either. If I could see the letter --
THE COURT: The question, Mr. Sloan, is you testified to your counsel that you had reviewed all of the documents and you were familiar with them.
THE WITNESS: Yes, sir.
THE COURT: So the question is, having reviewed those documents, can you say whether or not that document was received?
THE WITNESS: I cannot recall.
THE COURT: Thank you.

Following trial, the Trial Court found that National Fitness breached its contract with the Simpsons regarding their ability to cancel their membership. The Trial Court asked counsel for the respective sides to brief whether a violation of the TCPA had occurred, and, if there had been a violation of the TCPA, whether attorney's fees could be awarded without a finding of willful or intentional deception or an award of treble damages. On September 23, 2016, the Trial Court entered an order finding that National

Fitness had committed a deceptive act in contravention of the TCPA. The Trial Court found as follows:

**FINAL ORDER**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter was tried, without a jury, on September 6, 2016. The matter arises from a complaint filed by the Plaintiffs on June 3, 2015. The Defendants operate a series of health clubs under the name "National Fitness Center" (NFC) including a location at Walbrook Drive, Tennessee. In early October, 2012, the Plaintiffs spoke to Paul Watson, a representative of the Defendants, about purchasing a membership for the Walbrook Drive location which was under construction. The Plaintiffs allege violations of the Tennessee Health Club Act and the Tennessee Consumer Protection Act and also asked the court to declare their Membership Agreement void *ab initio*. The Plaintiffs, Shay and Brian Simpson testified. On behalf of the Defendant, Paul Watson and Lee Sloan testified. Post-trial, and at the request of this Court, Plaintiffs and Defendants, by and through their counsel, submitted post-trial briefs.

**Findings of Fact:**

1. The parties signed a Membership Agreement for a health club operated as NFC on October 10, 2012. (Exhibit 1 at trial)

2. The Membership Agreement provided: Buyer acknowledges having had ample time to review the **FRONT AND BACK** sides of this Membership Agreement and having done so and fully understands the terms contained herein and agrees to all terms contained in this Membership Agreement, including those on both the **FRONT AND BACK** sides and acknowledges that the terms set forth in this Membership Agreement constitute the entire agreement and that Buyer has not relied upon any statements or representation made by the Health Club operator or its employees that are not set forth herein.

3. The Plaintiff claims that there were numerous representations about the quality of the services and facilities and representations about available children's programs and that those representations were false and misleading. The Defendant denies making any such representations. Mr. Watson was the salesman who worked with Mr. and Mrs. Simpson and was present when they signed a contract.

4. The Defendant testified that there were drawings and maps of the facility that were present during the construction phase and the building was built consistent with those drawings. Mrs. Simpson testified that the pool area was smaller than represented but provided no specific information

on representations of size or dimension of the pool that would be inconsistent with any specific information that she was provided. Mr. Simpson also testified that the outdoor pool area was incomplete at opening. Mr. Watson and Mr. Sloan testified that the area was complete except that the pool was not open due to the time of year.

5. Mr. Sloan was the manager of the Defendants' Walbrook Drive facility. Mr. Watson testified that he had no authority to change the terms of the contract. Mr. Sloan testified he was an agent of the Defendant who was authorized to make changes to the contracts.

6. In addition to the Membership Agreement, the plaintiffs were also given a "10 Day Satisfaction Guarantee" that permitted the Plaintiff to cancel the Membership Agreement, "if you are dissatisfied for any reason". (Exhibit 1). The Satisfaction Guarantee stated that the Plaintiffs had "10 days from the opening day of the new club to cancel". The document required Plaintiff to obtain a "notice of cancellation" from the club and send it via certified mail to the address provided. Defendants' agents testified that the Plaintiff would have been able to cancel within the 10 day period for any reason under the terms of the "Satisfaction Guarantee".

7. The Plaintiff received notification of the club opening in mid-January 2014 either by voice message or by electronic mail.

8. Thereafter the Plaintiffs, on numerous occasion, expressed dissatisfaction with the club, the facilities and programs but received assurances that things would improve as the club became fully operational. Specifically, the Plaintiffs allege that the locker rooms were not as plush as represented and that there were certain locker room facilities that NFC claimed their membership did not include.

9. The Plaintiffs also testified that one of the primary purposes for enrolling in this club was the promise of an "active" children's program. The Plaintiff alleged that there were not active programs when the club opened. Mr. Sloan testified that the children's programs were being analyzed to track membership use to meet the needs of the most children. Mr. Sloan testified that this was one of the reasons why he granted the Plaintiffs an extension of the cancellation policy.

10. The Plaintiffs did use the health club facility on several occasions.

11. At some point near the end of February, 2014, the Defendant, through Mr. Sloan, offered to extend the "Satisfaction Guarantee". He stated that he wanted to appease them for their inconvenience and concerns and told them to give it some time. He told them to "take some additional time, a couple of weeks" and get back with me. Mr. Sloan also testified

that he thought it became clear that he meant two weeks. No other terms were discussed to effectuate cancellation.

12. The agreement to extend the Satisfaction Guarantee was not placed in writing.

13. On March 13, 2014, Mrs. Simpson sent a letter to the Board of Directors of NFC expressing her dissatisfaction and-expressing her desire to cancel their Membership Agreement. (This letter was introduced as Exhibit 2 at trial and the letter itself is dated March 3, 2014 but the plaintiff testified that it was a typographical error and it was actually sent March 13, 2014). The Defendant denied receipt of the letter but acknowledged receipt of some communication of an intent to cancel because the Defendant responded that the communication was untimely.

14. Mr. Sloan testified that he did not accept the cancellation because the notice came well after the two week extension he intended to convey.

15. The Defendant introduced evidence of Member check-ins for Shay and Brian Simpson. (Exhibit 4 at trial)

**Conclusions of Law:**

1. The Membership Agreement contract provides that neither Mr. Watson nor anyone else had authority to make specific representations about the facilities or programs beyond what is set forth in the agreement.

2. Both Plaintiff and Defendant agreed that the Plaintiffs had a 10 day Satisfaction Guarantee that allowed them to cancel for any reason within 10 days of the opening of the club.

3. There is no dispute that the Defendant granted an extension of the 10 day satisfaction guarantee. Plaintiff indicated that they were given a couple of weeks. Mr. Sloan indicated that the plaintiffs were given "a couple of weeks" and then later testified that it became clear that "I meant two weeks". To the extent that the Defendant offered an extension that they are now seeking to argue was for a fixed period of time, the Defendant has the burden to prove that the deadline was adequately communicated and there was a meeting of the minds on a crucial term of the "satisfaction guarantee" agreement. This Court finds that the Satisfaction Guarantee was extended for a couple of weeks and it was reasonable for the plaintiffs to exercise the cancellation as they did on March 13, by notice to the NFC Board of Directors.

4. The Defendant provided evidence of use of the club by the plaintiffs on several days but there was no evidence as to the dollar value of those visits.

5. The Court finds that the Plaintiffs properly exercised their right to cancel and they are therefore entitled to a return of all fees paid to the Defendants and to the cancellation of the contract.

6. The Tennessee Health Club Act, Tenn. Code Ann. §47-18-303, provides that a health club agreement shall be unenforceable if the agreement was entered into in reliance upon "any false, deceptive, or misleading information, representation, notice or advertisement". Tenn. Code Ann. §47-18-317 also provides that a violation of the Health Club Act will also constitute a violation of the Tennessee Consumer Protection Act as it would be considered an unfair or deceptive act.

7. This Court finds that there is insufficient evidence to find a violation of Tenn. Code Ann. §47-18-303.

8. The Tennessee Consumer Protection Act (TCPA) at Tenn. Code Ann. §47-18-104 provides a lengthy list of prohibited or deceptive acts. The contract at issue in this case was originally executed in October of 2012, one year after the TCPA was amended to remove the language that the TCPA list of deceptive acts was non-exclusive. Prior cases that define the list of deceptive acts as non-exclusive, are not applicable after the amendments to the TCPA that became effective October 1, 2011. Similarly, Tenn. Code Ann. §47-18-104 (b)(27), otherwise known as the "catch all provision" were no longer available to the Plaintiffs.

9. In addition to the per se violation of the TCPA alleged for violations of the Health Club Act, the Plaintiff asserts violations under Tenn. Code Ann. §47-18-104(b)(12) and (14).

10. At issue in this case, is whether the defendant's misrepresented or deceived the Plaintiffs as to the amount of time they had to cancel this agreement under the extension provided by Mr. Sloan. The Plaintiffs testified that they believed that they exercised their cancellation pursuant to the Satisfaction Guarantee within the time period granted by Mr. Sloan. Mr. Sloan took the position that the Plaintiffs did not timely cancel their contract because he believed he had made it clear that the extension was for two weeks and the cancellation fell outside [the] extension. There was no writing or documentation evidencing the specific terms of the extension of the "Satisfaction Guarantee".

11. The Court finds no evidence that Mr. Sloan willfully or intentionally misrepresented the terms of the extension of the guarantee and as such the Plaintiff is not entitled to an award of treble damages pursuant to Tenn. Code Ann. §47-18-109 (a)(3).

12. Tenn. Code Ann. §47-18-109(e)(1) provides that if a court finds a violation of the TCPA, "the court may award to the person bringing such action reasonable attorney's fees and costs. Neither Tenn. Code Ann. §47-

18-104 (12) or (14) have a requirement that the enumerated deceptive acts be willful or intentional. [U]nlike an award of treble damages under the Tennessee Consumer Protection Act, an award of attorney fees is not meant to be punitive in nature." *Miller v. United Automax*, 166 S.W.3d 692, 697 (Tenn. 2005).

13. A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or misleads or tends to mislead. *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005). The misrepresentation can be either intentional or negligent.

14. The Court finds no evidence of intentional misrepresentation in the communication of the extension deadline to the Plaintiffs. However, there was a negligent misrepresentation. Mr. Sloan caused the consumers to be misled as the amount of time that they had to cancel their contract and then communicated that the cancellation was denied because it was untimely. The Court finds this to be a negligent misrepresentation and, as such, a deceptive act under Tenn. Code Ann. §47-18-104(12) representing to the Plaintiffs that their transaction conferred rights and remedies that it did not have.

15. The Court finds that the Plaintiffs are entitled to reasonable costs and Attorney's fees. The Plaintiffs are instructed to file an affidavit of attorney's fees and costs to be submitted within ten (10) days of the entry of this order. The Defendant will have five days to submit any challenge to the requested attorney's fees.

**IT IS THEREFORE ORDERED:**

1. That the Plaintiffs' contract with NFC is cancelled and Plaintiffs are entitled to a return of all monies paid to NFC pursuant to the contract;

2. That the Plaintiffs' are entitled to an award of reasonable attorney's fees and costs, in amount to be determined by this Court; and

3. Costs of this matter are taxed to the Defendant.

4. This Order shall not be considered a final order pursuant to Rule 54 of the Tennessee Rules of Civil Procedure. A Rule 54 final order will be entered after the Court has made a determination on attorney's fees and costs.

The Simpsons tardily filed a motion for approval of attorney's fees, asserting that they had only received the September 23 Order on October 6, 2016. National Fitness filed a challenge to the Simpsons' motion, arguing that that the fee request should be denied as untimely. In December 2016, the Trial Court entered its final order, awarding $10,093.85 in attorney's fees and expenses to the Simpsons. The Trial Court's order stated:

## RULE 54 FINAL ORDER

This matter came before the Court on Friday, November 18, 2016 on Plaintiff's Motion for Approval of Fees / Alternative, Motion to Alter or Amend the Court's Final Order of September 23, 2016. Attorney Katherine Sanford Goodner was present on behalf of Plaintiffs and Attorney Stanley F. Roden was present on behalf of Defendants. Based upon the pleadings and arguments of counsel, the Court finds that Plaintiffs' Motion is well taken and is, therefore, **GRANTED**.

Accordingly, it is hereby **ORDERED, ADJUDGED and DECREED** as follows:

1. Plaintiffs' Motion to Approve Fees or in the Alternative to Amend is hereby **GRANTED,** and the Court's Final Order of September 23, 2016 is hereby amended to allow Plaintiffs thirty (30) days from the date of said order to file their Affidavit of Attorney's Fees and Costs.

2. That subject to the amendment referenced herein, the September 23, 2016 Final Order remains unaltered, and is incorporated herein as if fully restated.

3. That the Affidavit of Attorney's Fees and Costs submitted by Plaintiffs is reasonable, and that Plaintiffs are entitled to an award of attorney's fees and expenses in the amount of $10,093.85 to be paid by Defendants, for which execution may issue.

4. That to the extent any court costs are included in the award of attorney's fees and expenses, that such amount shall be reduced from the total court costs taxed to Defendants so as to preclude a double-recovery of any such amount.

5. That because no issues remain to be resolved in this matter, this Order is a Rule 54 Final Order pursuant to the Tennessee Rules of Civil Procedure.

National Fitness timely appealed to this Court.

## Discussion

Although not stated exactly as such, National Fitness raises the following three issues on appeal: 1) whether the Trial Court erred in finding that National Fitness committed a breach of contract; 2) whether the Trial Court erred in finding that National Fitness committed a deceptive act in violation of the TCPA; and, 3) whether the Trial Court erred in awarding attorney's fees pursuant to the TCPA. The Simpsons raise their own issue of whether they are entitled to attorney's fees incurred on appeal relative to their TCPA claim.

-14-

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

Regarding time for performance of contracts, this Court has stated:

> [T]he rule of reasonableness is applied to all types of contracts in Tennessee when an offer does not include a specific time within which an acceptance or performance is required. *See Shearer v. McArthur*, 2012 WL 5399221, at *5 (Tenn. Ct. App. Nov. 5, 2012) ("courts generally read into a contract a reasonable time standard when the contract does not include a time for performance"). In *Minor v. Minor*, 863 S.W.2d 51 (Tenn. Ct. App. 1993), for example, the Court of Appeals wrote that "[a] qualifying word which must be read into every contract is the word 'reasonable' or its equivalent 'reasonably.' " *Id.* at 54 (citing *Moore v. Moore*, 603 S.W.2d 736, 739 (Tenn. Ct. App. 1980)).

> \*\*\*

> [T]here are no set rules to determine what amount of time is "reasonable" when an offer does not specify how long it will remain open, or when an agreement does not specify when performance must be completed. Each case must be decided based on the unique circumstances of the parties and the situation under consideration.

*Reeves v. Pederson-Kronseder, LLC*, No. M2013-01651-COA-R3-CV, 2014 WL 1285702, at *4-5 (Tenn. Ct. App. Mar. 28, 2014), *no appl. perm. appeal filed*.

Concerning oral modifications to existing contracts, this Court has stated:

> " 'A modification to a contract is a change to one or more contract terms which introduces new elements into the details of the contract, or cancels some of them, but leaves the general purpose and effect of the contract undisturbed.' " *Constr. Crane & Tractor, Inc. v. Wirtgen Am., Inc.*, No. M2009-01131-COA-R3-CV, 2010 WL 1172224, at *10 (Tenn. Ct. App. Mar. 24, 2010) (quoting *Interstate Marketing Corp. v. Equipment Servs., Inc.*, No. M2005-00208-COA-R3-CV, 2006 WL 1547867, at *4

-15-

(Tenn. Ct. App. Jun. 6, 2006)). After a written contract is made, it may be modified by the express words of the parties in writing or by parol, where both parties consent to such modifications. *In re Estate of Nelson*, No. W2006-00030-COA-R3-CV, 2007 WL 851265, at *18 (Tenn. Ct. App. Mar. 22, 2007) (citing *Galbreath v. Harris*, 811 S.W.2d 88, 91-92 (Tenn. Ct. App. 1990)). "Generally, Tennessee courts follow the rule that 'allows contracts to be orally modified even if the contracts specifically state that the contract can only be modified in writing.' " *Markow v. Pollock*, No. M2008-01720-COA-R3-CV, 2009 WL 4980264, at *8 (Tenn. Ct. App. Dec. 22, 2009) (quoting *Moulds v. James F. Proctor, D.D.S., P.A.*, 1991 WL 137577, at *3 (Tenn. Ct. App. July 29, 1991)). "Even where the written contract prohibits oral modifications of the agreement, oral alterations will still be given effect if otherwise valid, as 'men cannot tie their hands or bind their wills so as to disable them from making any contract allowed by law, and in any mode in which it may be entered into.' " *Estate of Nelson*, 2007 WL 851265, at *18 (quoting *Co-operative Stores Co. v. U.S. Fid. Guar. Co.*, 137 Tenn. 609, 195 S.W. 177, 180 (1917)). "A party's agreement to a modification need not be express, but may be implied from a course of conduct; this is true even where the agreement expressly specifies, as in this case, that the parties may only modify the agreement in writing." *Constr. Crane & Tractor, Inc.*, 2010 WL 1172224, at *10 (citing *Galbreath*, 811 S.W.2d at 91; *Cooperative Stores Co.*, 195 S.W. at 180).

*Lancaster v. Ferrell Paving, Inc.*, 397 S.W.3d 606, 611-12 (Tenn. Ct. App. 2011).

Tenn. Code Ann. § 47-18-104(b)(12) (2013) provides as relevant to this appeal: "The following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful and in violation of this part . . . (12) Representing that a consumer transaction confers or involves rights, remedies or obligations that it does not have or involve or which are prohibited by law; . . ."

As to the standard for determining what constitutes a deceptive act under the TCPA, this Court has explained:

[T]he standards to be used in determining whether a representation is "unfair" or "deceptive" under the TCPA are legal matters to be decided by the courts. *Lavie v. Procter & Gamble Co.*, 105 Cal.App.4th 496, 129 Cal.Rptr.2d 486, 491 (2003); *State ex rel. Stovall v. DVM Enters.*, Inc., 275 Kan. 243, 62 P.3d 653, 657 (2003); *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 370 S.E.2d 375, 389 (1988); *Fisher Controls Int'l, Inc. v. Gibbons*, 911 S.W.2d 135, 139 (Tex. App. 1995). However, whether a

specific representation in a particular case is "unfair" or "deceptive" is a question of fact. *Davidson v. General Motors Corp.*, 57 Mass.App.Ct. 637, 786 N.E.2d 845, 851 (2003). The broad phrasing of the statute suggests that, at the very least, the terms "unfair" and "deceptive" should not be limited to a set of specific acts that can be readily catalogued in a judicial opinion or otherwise. *See Pan American World Airways v. United States*, 371 U.S. 296, 307-08, 83 S.Ct. 476, 483, 9 L.Ed.2d 325 (1963).

*Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005).

Further analyzing deceptive acts as defined by the TCPA, this Court also has explained as follows:

> The Tennessee Consumer Protection Act, Tennessee Code Annotated Sections 47-18-101, *et seq*. ("TCPA"), prohibits, among other things, "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Tenn. Code Ann. § 47-18-104(a). . . . A "deceptive" act or practice is "one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as a matter of fact." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 116 (Tenn. Ct. App. 2005) (citations omitted). An act or practice may be deemed unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id*. at 116-17 (citing 15 U.S.C. § 45(n)). Because the TCPA is remedial, courts have determined that it should be construed liberally in order to protect the consumer. *Id*. at 115. In order to recover under the TCPA, a plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act; and (2) that the defendant's conduct caused an "ascertainable loss of money or property...." *Id*. (quoting Tenn. Code Ann. § 47-18-109(a)(1)); *see also Cloud Nine, L.L.C. v. Whaley*, 650 F.Supp.2d 789, 798 (E.D. Tenn. 2009) ("plaintiffs asserting claims under the [TCPA] are required to show that the defendant's wrongful conduct proximately caused their injury) . . . .
>
> Whether a particular representation or act is "unfair" or "deceptive," within the meaning of the TCPA, is a question of fact, *Id*. at 116 (citation omitted), which we review *de novo* upon the record with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d).

*Audio Visual Artistry v. Tanzer*, 403 S.W.3d 789, 809-10 (Tenn. Ct. App. 2012).

We first address whether the Trial Court erred in finding that National Fitness committed a breach of contract. On February 14, 2014, Ms. Simpson and Sloan modified by oral agreement the Simpsons' membership agreement to allow the Simpsons "a couple of weeks" to consider whether to cancel their membership, the original ten day opportunity they had under the original terms of the contract having expired long before. More specifically, Ms. Simpson testified that after a couple of weeks had elapsed, "[Sloan] told us that he would work with our agreement." Sloan testified that he told Ms. Simpson: "If you still have issues with everything going on, let me see what I can do for you." The primary disputed point is whether the parties contracted to set a firm two week, fourteen day deadline to act.

National Fitness argues a "couple of weeks" means two weeks, period. The Simpsons, on the other hand, argue that "a couple of weeks" is vaguer and lacks precision. We agree with National Fitness that "a couple" generally means two of something. However, it is commonly understood that "a couple" has a more informal meaning that can convey a few of something, but not necessarily precisely two. Ms. Simpson and Sloan effected the oral modification of the contract through a casual phone conversation. There was no written document laying out the terms of the modification. The Trial Court found and held that the "satisfaction guarantee" portion of the membership agreement was extended sufficiently that the Simpsons' cancellation was effective. In our judgment, under these circumstances, "a couple of weeks" does not mean a rigid fourteen days. Our view is bolstered by the fact that Ms. Simpson and Sloan both testified that when the couple of weeks was up, the parties would engage in further communication to discuss the status of the Simpsons' membership. This suggests the parties intended the conversation would continue.

Ms. Simpson attempted by a phone call to exercise her right to cancel some 23 days after the "couple of weeks" conversation with Sloan on February 14 and then by letter to the Board of Directors on March 13. We, as did the Trial Court, hold that Ms. Simpson's attempt to cancel was effective. Given the informal nature and ambiguity in the parties' oral modification, and, in light of the particular facts of this case, we hold that Ms. Simpson timely exercised her right to cancel. We affirm the Trial Court in its determination that the Simpsons effectively exercised their right to cancel and that they were entitled to a refund of any monies paid.

We next address whether the Trial Court erred in finding that National Fitness committed a deceptive act in violation of the TCPA. It is unclear to us what the deception consists of in this case. Apparently the deception found by the Trial Court was the parties' oral modification of the Simpsons' membership agreement to give the Simpsons an additional "couple of weeks" to consider their membership. The parties did

so in an informal manner, and in so doing, left an ambiguity that resulted in this litigation, requiring courts to determine whether Ms. Simpson exercised her right to cancel in time. However, any ambiguity was the result of the parties' mutual oral modification. More importantly, the Trial Court held, as affirmed in this Opinion, that the Simpsons' March attempt to cancel was timely and effective under the oral modification. This being so, we find this oral modification was not deceptive as it neither caused the Simpsons to believe something that was false nor mislead them but instead gave the Simpsons the additional time to cancel as they claimed. Therefore, we reverse the Trial Court in its determination that National Fitness violated the TCPA. We also reverse the Trial Court in its award of attorney's fees to the Simpsons, which were awarded based on the TCPA finding that we now reverse.

In a nutshell, we affirm the Trial Court's determination that the Simpsons effectively exercised their right to cancel under the membership agreement as modified by the parties and that they were entitled to a refund of any monies paid to National Fitness. However, the Trial Court erred in finding a violation of the TCPA. There was no deception here, only a mutually created ambiguity in a contract term that was found by the Trial Court and this Court to give the Simpsons exactly what they wanted. We, therefore, reverse the Trial Court in its finding a deceptive act under the TCPA and in its award of attorney's fees to the Simpsons pursuant to the TCPA. As we find no deceptive act under the TCPA, we decline to award the Simpsons their attorney's fees incurred on appeal.

## Conclusion

The judgment of the Trial Court is affirmed, in part, and reversed, in part, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed one-half equally against the Appellants, National Fitness Center, Inc. and National Fitness Center, LLC, and their surety, if any, and one-half against the Appellees, Shay Simpson and Brian Simpson.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

-19-